UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CYNTHIA PHELPS,                                                                                                 PLAINTIFF

v.                                                                                                       CIVIL ACTION NO. 3:07-CV-291-S

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,        DEFENDANT

**MEMORANDUM OPINION**

Lindsey Kirby,[1] a driver insured by State Farm Mutual Automobile Insurance Company, pulled out of a gas station without leaving Cynthia Phelps sufficient room to stop. The vehicles collided, and Phelps suffered serious injuries requiring back surgery.[2] Phelps eventually recovered the full $50,000 limit on Kirby's insurance policy. She has nonetheless sued State Farm on the theory that it engaged in dilatory tactics amounting to bad faith in violation of Kentucky's Unfair Claims Settlement Practices Act (UCSPA), KRS 304.12-230.

The court granted summary judgment in part, dismissing Phelps's claims under two of the three statutory subsections that she invoked. The remaining "unfair claims settlement practice" is defined as follows: "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." KRS 304.12-230(6). However, "a condition precedent to bringing a statutory bad faith action is that the claimant was damaged by reason of the violation of the statute." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452 (Ky. 1997) (*citing* KRS 446.070). The parties failed to address this "condition precedent" in their initial

---

[1] The court's prior opinion identified Ms. Kirby as "Lindey," as her name was represented in some of the papers filed in this matter. The court is still not entirely sure which name is correct, but the question is obviously immaterial.

[2] Phelps's car was also damaged in the wreck; she recovered separately for this property loss.

briefing, so the court requested that they file additional papers setting out their positions and the evidence in support thereof. The parties have complied with the court's order and have filed briefs and evidence, so the case is finally ripe for consideration.

In claiming that she suffered humiliation and embarrassment as a result of State Farm's actions, Phelps begins by advising the court that "the adjuster was really tough to deal with and made her feel like she was lying." (Supplemental Resp. 2.) But as State Farm points out, Phelps only dealt personally with State Farm representatives during the processing of her property damage claim. She admitted as much in her deposition:

> Q. . . .
> But at no time did State Farm refuse to pay you property damage; you just disagreed with what the value was until you finally agreed?
>
> A. Yes.
>
> Q. With respect to your personal injury claim handling—
>
> A. At that point, I wasn't dealing with State Farm because attorneys were involved.

(C. Phelps Dep. 106.) Phelps's personal interactions with State Farm employees are thus not relevant to the bad-faith claim asserted in this action: The damages she is seeking were allegedly caused by the defendant's egregiously slow handling of her injury claim, on which its employees' possible rudeness had no bearing.

Phelps has presented other evidence that she was embarrassed and humiliated by the delay in settlement. She was, she says, unable to make some of her house payments and was forced to borrow money from her parents. (*Id.* at 77.) According to the plaintiff's husband, she suffered from mental anguish as a result of the drawn-out nature of the process. (D. Phelps Dep. 43-45.) The

plaintiff has also claimed in interrogatory responses that the financial stresses caused by the delay in settlement caused her embarrassment, humiliation, guilt, and anxiety. (Resp. to Interrog. No. 8.)

The court is also in agreement with the plaintiff that in the event she is able to show bad faith, Kentucky law permits her to recover interest on the amount wrongfully withheld. Where there is no good-faith dispute regarding the amount of a liquidated claim, interest accrues from the date on which the claim ought to have been paid had the parties dealt in good faith. *See Wittmer v. Jones*, 864 S.W.2d 885, 891 (Ky. 1993). Finally, KRS 304.12-235(3), which entitles a bad-faith claimant to reimbursement for attorney's fees, appears to apply to third parties. *See Tenn. Farmers Mut. Ins. Co. v. Jones*, No. 2007-CA-911-MR, 2008 Ky. App. Unpub. LEXIS 19, at *16-*17 (Ky. Ct. App. Sept. 12, 2008). The court is therefore of the opinion that reasonable attorney's fees occasioned by State Farm's alleged failure to settle the case promptly and in good faith can constitute damages for purposes of this suit.

Phelps has thus met the "condition precedent" to her bad-faith claim, and the court will now turn to the substance. The elements of a KRS 304.12-230(6) claim are as follows: (1) the insurer was obligated to pay the claim; (2) the insurer lacked a reasonable basis in law or fact for failing to pay the claim; and (3) the insurer either knew that there was no reasonable basis for failing to pay or acted with reckless disregard for whether such a basis existed. *Motorists Mutual*, 996 S.W.2d at 452 (*citing Wittmer*, 864 S.W.2d at 890). To prevail, a plaintiff must present evidence of the sort of conduct that warrants a punitive damages instruction—that is, evidence of "conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Wittmer*, 864 S.W.2d at 890 (citations omitted). State Farm concedes the first element of the claim (it would never have paid the claim unless it felt an obligation to do so), and doesn't mount

an argument regarding its knowledge or reckless disregard for the truth. All the attention surrounds the second element: whether State Farm acted reasonably. This being a motion for summary judgment, the movant bears the burden of showing that there is no genuine issue of fact on this subject—i.e. that no reasonable juror could conclude from the evidence that State Farm lacked a reasonable basis for failing to attempt in good faith to settle more promptly than it did. Fed. R. Civ. P. 56(c).

Addressing this issue begins with a brief recapitulation of the facts regarding State Farm's handling of Phelps's claim. The car accident occurred on July 18, 2003. State Farm never contended that anyone other than its insured was the responsible party. The insurer's investigation of the claim revealed by February 2004 that Phelps had preexisting back problems arising out of an earlier (1999) car accident. By April 4, 2004[3] State Farm had received a letter from Phelps's attorney (Thomas Carroll) that valued his client's medical expenses at $20,286.70 and her lost wages at $2,333.52 (for a total of $22,620.22), and in which he requested information on the insurance policy's liability limit. The letter did not contain a demand for any particular sum. State Farm did not respond to this letter, and did not immediately tender a settlement offer. Pursuant to a request for documentation, on October 24, 2004, State Farm received a set of medical records reflecting that Phelps had undergone her last treatment for the 1999 injuries in May of 1999. State Farm then assessed the claim's total value at between $24,620 and $49,620,[4] and offered to settle the claim for $25,000 on October 28.

---

[3] The letter is marked received on April 2, 2004, but the plaintiff repeatedly cites April 4 as the relevant date.

[4] The disparity between the two evaluations is accounted for by differences in the estimated values of Phelps's past pain and suffering ($10,000 to $30,000), future pain and suffering ($2,500 to $7,000), and future medical expenses ($0 to $500).

Carroll considered this offer "unrealistically low unless that was the extent of policy limits" (Carroll Aff. ¶ 3), but he did not make a counteroffer or otherwise respond.

Not having heard back from Carroll more than two months after its offer letter, State Farm attempted to contact him (without success) on January 3, 2005. After almost three more months had passed, Carroll finally called State Farm on March 29, 2005. (Lirely Dep. 46-47.) At that time he opined that the case was worth as much as $150,000, but again did not proffer a demand or counteroffer. (Carroll Aff. ¶ 3.) Carroll again requested information about the limits of Kirby's insurance policy, but State Farm's representative declined to answer that question. (*Id.*) Negotiations went no further, and Carroll filed suit on April 25, 2005.

In the first eleven months of the ensuing litigation, Carroll made no response to State Farm's previous settlement offer of $25,000, which had not been withdrawn. Nor did he make any further settlement demands, overtures, or counteroffers.

As the result of discovery, State Farm obtained additional medical records and documentation of the plaintiff's wage losses. Phelps gave a deposition on March 22, 2006 in which she stated that she had fully recovered from her 1999 injury by the time of the 2003 accident. Following the deposition, State Farm's counsel advised the insurer that Phelps would make a credible witness and that it should increase its offer in order to settle the case. (Jones Dep. 18.) State Farm's counsel revealed its policy limits to Carroll in early April 2006, and Carroll made his first and only offer to settle the case (for the full $50,000) on or about April 11. State Farm counteroffered $40,000, which

Carroll refused. State Farm finally offered its policy limits on April 12, and on April 13 Phelps accepted and settled the case.[5]

For guidance in determining how to apply Kentucky's bad-faith law to these facts, we turn to the *Motorists Mutual* case, which features strikingly similar facts. The plaintiff, Jeffrey Glass was severely injured in an automobile accident on May 13, 1988 and eventually incurred more than $82,000 in medical expenses. *Motorists Mutual*, 996 S.W.2d at 440-41. The insurance policy in question had a $50,000 limit, but Motorists Mutual initially offered only $25,000. *Id.* at 443. Glass refused this offer, *id.*, but his attorney did not tender a demand or counteroffer until several months had passed. *Id.* at 445. That demand was for $500,000, ten times the policy limit, so Motorists Mutual refused the demand. *Id.* Glass filed suit on May 3, 1990, alleging (*inter alia*) violation of the UCSPA. The case was tried to a jury, which found for Glass.

The Kentucky Supreme Court vacated this verdict in several respects, including Glass's statutory bad-faith claim. The court observed that the UCSPA claim "boil[ed] down to a claim that [Motorists Mutual] did not promptly offer to pay Jeffrey Glass what his claim was reasonably worth." *Id.* at 452. This theory of recovery, however, ran up against the rule that "mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception. In other words, there must be proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Id.* at 452-53 (*citing Zurich Ins. Co. v. Mitchell*, 712 S.W.2d 340

---

[5] State Farm claims that the policy-limits offer was motivated by its learning of $14,656 in additional medical bills on April 12. (Jones Dep. 22.) Phelps maintains that the information was not new at all, but was rather the portion of her preexisting medical expenses that were billed to her health insurer. (*See* Supplemental Resp. 3 n.1.) As late as May 2008, however, when State Farm employee Lillian Jones gave her deposition, the defendant apparently thought that the expenses were newly reported. While this dispute must be resolved in Phelps's favor for present purposes, the court is not of the opinion that it makes much difference to the case's outcome.

(Ky. 1986)). Furthermore, "[i]t is not bad faith *per se* for an insurance company to offer to settle for less than its policy limits. That is particularly true where, as here, the claimants *never demanded payment of the policy limits or any other sum prior to retaining an attorney*." *Id.* at 453 (*citing Davis v. Home Indemnity Co.*, 659 S.W.2d 185, 189 (Ky. 1983); *Manchester Ins. & Indemnity Co. v. Grundy*, 531 S.W.2d 493, 500 (Ky. 1975)). The court went on: "The UCSPA does not require that a claim be evaluated, or that it be evaluated correctly. It only requires that payment of a claim not be refused without conducting a reasonable investigation based on all available information, KRS 304.12-230(4), and that a good faith attempt be made to effectuate a prompt, fair and equitable settlement, KRS 304.12.230(6)." *Id.* at 454.

The same principles apply in this case and mandate entry of summary judgment for State Farm. There are five places in the chronology of this case that Phelps might cite as the locus of State Farm's bad faith, but none of them will support recovery. First, several months elapsed before State Farm tendered its first offer, but that delay is attributable to a reasonable investigation into Phelps's claims and injury history. Second, Phelps places great weight on the alleged inadequacy of the initial $25,000 offer, but, as *Motorists Mutual* held, a small offer does not constitute bad faith in the absence of some improper purpose. There is no evidence of such a purpose in the record, and for all the record shows the initial offer was the opening gambit in a negotiation, not an act of coercion or bad faith. The settlement offer was the result of State Farm's detailed and not unreasonable internal evaluation. Third, almost a year and a half passed before State Farm's next offer of $40,000, during which time Phelps filed her initial lawsuit. A substantial part of this delay is attributable to Carroll's failure to respond to or communicate with State Farm. Carroll actually first propounded a settlement demand on April 11, 2006. His failure to respond before then to State Farm's October 2004

settlement offer did not create a subsequent duty on State Farm's part to bid against itself or to repeatedly chase down a counteroffer at the risk of liability for bad faith. Fourth, the $40,000 offer was another step in the negotiation, and did not constitute bad faith in the absence of extortion or deception, of which there is again no evidence. Fifth, there was a one-day delay between Phelps's rejection of that offer and State Farm finally offering $50,000, but there is once again no evidence of impermissible motive. (Furthermore, the gap in time was so short as to be de minimis.) Thus in each case State Farm's failure to pay the full amount of its policy limits was reasonably justified by either its investigation or the ongoing good-faith negotiation process.

There being no evidence of bad faith, summary judgment will be entered by separate order.